UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEBARA DECAMP,

                Plaintiff,

     v.                                        Case No. 15-C-1261

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## DECISION AND ORDER

     This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Debara DeCamp's applications for a period of disability and disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. She claims the decision is not supported by substantial evidence and violates several of the Commissioner's own rules and regulations. For the reasons set forth below, the Commissioner's decision will be affirmed.

## BACKGROUND

     On April 6, 2011, Plaintiff, age 47 at the time, completed applications for disability and DIB as well as SSI with her alleged disability beginning February 20, 2009. She listed a brain tumor, neck fusion, bipolar disorder, and a broken neck as the conditions that limited her ability to work. R. 177. At the time she submitted her applications, she was 5'8" and weighed 160 pounds. *Id.* Following the denial of her applications initially and on reconsideration, Plaintiff requested a hearing before an administrative law judge (ALJ). ALJ Debra Meachum conducted a hearing on December 17, 2012.

Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 44–74. At the time of the hearing, Plaintiff lived with a roommate, her dog, and her bird in her two-story house. R. 48. Plaintiff testified that she had completed high school and began working as a server at a women's club. She left that position for a bartending position. Her job duties included opening the bar; getting ice out of the bins; restocking shelves with beer, wine, and soda; cutting limes and lemons; answering the phone; and taking orders. R. 49–50.

On January 23, 2009, Plaintiff sustained an injury to her back in a car accident in Oregon, where she was living at the time. R. 668–69. She received chiropractic care over the next several months, R. 253–64, but continued to complain of pain and presented for an enhanced MRI in late April 2009. R. 244–47. The MRI showed mild degenerative disc disease and grade 1 spondylolisthesis at L5-S1. The other discs in the lumbar spine appeared normal. The physician also noted mild narrowing of the L5 foramina which he thought might be associated with minimal irritation of exiting L5 nerve roots. R. 270.

Within the following year, Plaintiff got married, quit her job, and moved to Wisconsin. She presented at Waukesha Memorial Hospital on March 15, 2010, with a complaint of back pain. R. 269. On April 26, 2010, Plaintiff underwent a L5-S1 posterior lumbar interbody fusion. R. 266. Her husband subsequently passed way in 2010. R. 50.

When asked how her physical impairments keep her from working, Plaintiff responded the pain in her left leg and back surgery make it hard to stand and walk. R. 51. Prior to her car accident, Plaintiff said she had been involved in a work accident that resulted in a neck injury. R. 55–56. She reported she had rods and plates put in her neck. R. 55. Plaintiff testified that she also has bad headaches, has a small pineal tumor in her head, and has difficulty sleeping. R. 51, 53.

She further claimed she has pain in her hands and reported having carpal tunnel surgery only in her right hand due to insurance restraints. R. 51. Her hand pain causes her to drop things. Plaintiff testified that on top of everything else, she is bipolar, which leaves her feeling depressed and agitated. R. 56.

Plaintiff then testified about her average day. She stated she wakes up but does not shower every day. She testified that she spends the day sitting on the couch or a chair, or walking around the house. R. 57. She usually watches movies or reads magazines and takes one nap lasting 45 minutes to an hour. R. 57, 59. Plaintiff testified she does not leave her house because she is not a people person. She reported her roommate does the household chores, including the laundry and cleaning the bathroom. R. 57. Plaintiff claimed she cooks frozen dishes and soup and puts her dishes in the sink. R. 58. She testified she does not drive, not because her concentration affects her ability to drive, but because she is in a lot of pain and does not want to drive with a numb leg. *Id.* Plaintiff asserted she could walk five to seven minutes at a time, stand for five minutes, and sit for five to seven minutes. R. 59–60. She testified she could lift and carry about two pounds. R. 60.

In a written decision dated January 14, 2013, the ALJ concluded Plaintiff was not disabled. R. 16–26. The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making ALJ Meachum's decision the final decision of the Commissioner. R. 6. Having exhausted her administrative remedies, Plaintiff filed a complaint in June 2014 in the United States District Court for the Eastern District of Wisconsin, seeking judicial review of the ALJ's decision. The matter was ultimately reversed and remanded for further proceedings based upon a stipulation of the parties. R. 832–44; *see DeCamp v. Colvin*, 2:14-cv-00646-RTR (E.D. Wis.).

ALJ Meachum held a second administrative hearing on remand on June 24, 2015. Both Plaintiff, who was again represented by counsel, and a VE testified. R. 780–806. At the time of the second hearing, Plaintiff lived with her husband (she had remarried) in a house in Elkhorn, Wisconsin. R. 785. Plaintiff testified that the conditions that prevented her from working include the chronic pain in her back that radiates down her left leg and her migraines. R. 784. She attributed her back pain to the 2009 motor vehicle accident. R. 790. She stated the pain in her leg affects her ability to walk and causes a limp. *Id.* She wears her back brace every day. R. 793. Plaintiff testified that she can stand for five minutes and sit for fifteen minutes. R. 792. As to her migraines, Plaintiff indicated she gets a day-long migraine four times a week. R. 786. Although the medication helps with her headaches, she feels drowsy when she takes it. R. 786. Plaintiff testified that she currently weighed 200 pounds. R. 784. She testified that her weight affects her ability to get in and out of a chair and to walk. R. 789–90. Plaintiff also claimed she has problems in her right hand and elbow. R. 792. She stated she got injections in her elbow, though the injections did not relieve the pain. R. 792, 795. She wears a wrist brace on her right hand. R. 795. She also claimed that she started having pain in her left hand. R. 793. With respect to her mental impairments, Plaintiff testified that she has bipolar depression. *Id.* She stated she gets extremely cranky at times and loses her patience with people. R. 794. Though she had a history of drug and alcohol abuse, she testified she did not have a current problem. R. 796.

Plaintiff testified that she when she wakes up in the morning, she puts ice on her back and takes her pain pills and anti-depressant medications. Then she sits on the couch for the rest of the day and watches television or reads magazines. R. 785. She uses the computer to communicate with her family, who live in Portland, Oregon. R. 788. If the weather is nice, she sits outside, reads

4

magazines, and takes a nap. Then she goes back inside to take another nap. R. 785. She testified that she lays down approximately four times a day. R. 789. Plaintiff walks to the mailbox every day, which is about 30 yards from the house, to get the mail. R. 786. She is able to get her own coffee, make a sandwich, and shower on her own. *Id.* She noted that her husband does the shopping and cooking, and she hires a friend to help with the cleaning once a week. R. 785. Although she participated in pool therapy, she has not been able to attend her classes because her husband works more hours and is unable to drive her to the pool. R. 787. Plaintiff testified that she stopped driving because it hurt her back. *Id.*

In a decision dated July 31, 2015, the ALJ found Plaintiff was not disabled. R. 737–54. Following the agency's five-step sequential evaluation process, the ALJ concluded at step one that Plaintiff met the insured status requirements since March 31, 2014 and has not engaged in substantial gainful activity since February 20, 2009. R. 740. At step two, the ALJ found Plaintiff had the following severe impairments: history of cervical discectomy in 2003; right carpal tunnel release in 2004; L5-S1 lumbar fusion in 2010; chronic back pain; longstanding neoplasm of the pineal gland; headaches; history of substance abuse; and affective and anxiety disorders. She also noted Plaintiff received treatment for other impairments that do not meet the definition of severe, including a non-malignant lesion on her right breast, right elbow pain, a dog bite, a tick bite, and obesity. At step three, the ALJ determined Plaintiff's impairments or combinations of impairments did not meet or medically equal any listed impairments under 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

After reviewing the record, the ALJ concluded Plaintiff has the residual functional capacity (RFC) to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: "She can only occasionally stoop, crouch, kneel, crawl, and flex or extend her

5

neck. She is limited to unskilled work, SVP-2 or less, with no fast-paced production line or tandem tasks and few if any, changes in the work setting, meaning that the workplace and tasks change no more than occasionally and only one to two times per month, at most. She can only occasionally interact with coworkers, supervisors, and the public. She may be off task up to 10 percent of the workday, in addition to normal breaks." R. 744. With these limitations, the ALJ found at step four that Plaintiff is unable to perform her past work as a bartender and server. Nevertheless, at step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as machine tender, sorter, and office helper. R. 753. Based on these findings, the ALJ concluded Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review. Thereafter, Plaintiff commenced this action for judicial review.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Evaluation of Alleged Symptoms

Plaintiff asserts the ALJ failed to apply the appropriate standard in evaluating her symptoms. The Social Security regulations set forth a two-step procedure for evaluating a claimants's statements about the symptoms allegedly caused by her impairments. *See* 20 C.F.R. § 416.1529. First, the ALJ determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.* The ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record.

7

Until recently, the evaluation of the intensity, persistence, and limiting effects of the claimant's symptoms was viewed by the SSA as a credibility determination. *See* SSR 96-7p. In March 2016, the SSA released a new ruling regarding the evaluation of symptoms in disability claims. SSR 16-3p; "Titles II and XVI: Evaluation of Symptoms in Disability Claims," 2016 WL 1119029 (effective March 28, 2016). This new ruling supersedes SSR 96-7p. In adopting SSR 16-3p, the SSA eliminated the use of the term "credibility" from its sub-regulatory policy in order to "clarify that subjective symptom evaluation is not an examination of an individual's character." 2017 WL 5180304, at *2. The question the SSA asks under SSR 16-3p, is whether the symptoms claimed are "consistent with the objective medical and other evidence in the individual's record." *Id.* Plaintiff asserts the court should apply SSR 16-3p in reviewing the ALJ's decision, but on October 25, 2017, the SSA republished SSR 16-3p, clarifying that the regulation should only be applied to determinations and decisions issued on or after March 28, 2016. *Id.* at *1. Since SSR 96-7p was in effect at the time the ALJ issued her decision in this case, it is this ruling that governs my review here.

A court's review of a credibility determination is "extremely deferential." *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). On judicial review, the court must "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). The court is not to reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Elder*, 529 F.3d at 413–14 (internal quotation marks and citations omitted).

In this case, Plaintiff claimed she was disabled due to the following impairments: a brain tumor, neck fusion surgery, a broken neck, and bipolar disorder. R. 744 (citing R. 177). As recounted by the ALJ, Plaintiff testified she had 8 to 12 migraines each month; could sit and stand for less than 30 minutes at a time and walk less than 15 minutes at a time; and is most comfortable lying down. If she had to change positions, Plaintiff reported she could sit between 2 and 3 hours a day, stand for 3 hours a day, and walk between 2 and 4 hours a day. Plaintiff stated she avoids using stairs and claims the neurological deficits in her legs cause her to have an unsteady gait. She reported difficulty getting along with others as well as handling stress and changes in routine. She also testified that she was unable to pay attention for long periods of time. R. 744–45.

In assessing the credibility of her statements about her symptoms, the ALJ wrote: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. When considered in light of the record as a whole, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." R. 745.

Plaintiff first challenges this conclusion as being improper boilerplate. She asserts this construction is "meaningless" because the phrase "'not entirely credible' yields no clue to what weight the trier of fact gave the testimony." ECF No. 10 at 7 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). While the Seventh Circuit has criticized boilerplate language in an ALJ's decision as being "meaningless" and "unhelpful," *see Shauger*, 675 F.3d 696, it has recently held that its use is "innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony." *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *see also Pepper v.*

*Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013) ("[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination."). The ALJ's use of boilerplate language in this case was not problematic because, as explained below, the ALJ thoroughly discussed the substantial evidence that supports her decision.

Plaintiff also asserts the ALJ failed to explain why she found certain statements by the Plaintiff to be untrue. For example, Plaintiff contends the ALJ "made clear" that Plaintiff received assistance from others but never explained why that testimony was not credited as true. ECF No. 10 at 11. Plaintiff also demands that the ALJ weigh her statements where she estimated she could sit 10 minutes, stand 15 minutes, and walk 10 minutes as well as her testimony indicating that she occasionally wears a back brace and wrist braces. *Id.* at 12.

An ALJ is not required to "specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability"). An ALJ is not a polygraph machine that assesses each statement individually. That kind of detail is neither required nor necessary for judicial review. Implicit in the ALJ's finding that Plaintiff could perform light work is her further finding that she was not as debilitated as she claimed. The crucial question is whether the ALJ provided reasons based on the record before her to support this conclusion.

Plaintiff next claims the ALJ inappropriately "played doctor" by improperly relying on her own interpretation of the medical opinions and concluding Plaintiff's subjective complaints of pain were not fully supported by objective medical evidence. ECF No. 10 at 8–9. Indeed, an ALJ may

not reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work "solely because the available objective evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2); SSR 96-7p. But that does not mean that the ALJ cannot consider the medical evidence in assessing a claimant's credibility. After all, objective medical evidence is "a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of an individual's symptoms and the effects those symptoms may have on the individual's ability to function." SSR 96-7p, 1996 WL 374186, at *6 (internal quotation marks and citations omitted); 20 C.F.R. § 404.1529(c)(2).

Here, the ALJ's discussion of the medical evidence in relation to Plaintiff's alleged symptoms complied with the SSA's regulations and rulings on assessing claimant credibility. The ALJ recognized that Plaintiff has impairments that affect her ability to work, but not to the degree alleged. R. 745. The ALJ noted that although Plaintiff underwent a cervical discectomy in 2003, some six years before her alleged onset date, for a cervical disc protrusion that caused radiculopathy and pain, Plaintiff did not complain of further neck pain to her treating physicians. Clinical examinations revealed normal range of motion in her neck and shoulders. R. 746 (citing R. 986, 999). The ALJ also considered that while Plaintiff had carpal tunnel release surgery on her right hand in 2004, the consultative examiner reported in 2012 that Plaintiff handled objects, including paperwork and her ID card, without any fine motor difficulties. Notwithstanding Plaintiff's testimony that she had trouble using her hands, the treatment notes contain no mention or evidence of upper extremity issues. Instead, upon examination, Plaintiff had normal range of motion, full upper extremity strength, and normal neurological examinations. *Id.*

11

The ALJ recognized Plaintiff suffers from lower back pain and underwent lumbar fusion surgery at L5-S1 in April 2010 after an MRI and CT scan revealed mild to moderate degenerative changes, grade 1 spondylolisthesis, and mild narrowing of the L5 foramina with possible irritation of the exiting nerve root. *Id.* (citing R. 244, 277, 283). But two months after the surgery, her treating neurologist, Dr. Andrew Beykovsky, reported she was doing "remarkably well." *Id.* (citing R. 482). In May 2011, Plaintiff complained of lower back pain that was triggered three months prior when she shoveled snow. *Id.* (citing R. 476). An updated MRI of the lumbar spine in November 2011 revealed full resolution of the previously identified issues. *Id.* Dr. Beykovsky subsequently recommended physical therapy. *Id.* (citing R. 474). The ALJ noted Plaintiff complained of pain intermittently in 2013 and 2014, but the clinical examinations were normal. Plaintiff had full strength; normal sensation and reflexes; no tenderness to palpation; normal range of motion; a normal gait; and the ability to heel, toe, and tandem walk. R. 747 (citing R. 719, 986, 999).

The ALJ further recognized that Plaintiff has a longstanding pineal tumor that was first identified in 2010 by an MRI of her brain. Dr. Beykovsky recommended biannual monitoring of the tumor and suggested Plaintiff receive migraine treatment through her primary care physician. *Id.* (citing R. 390). Although Plaintiff continued to complain of frequent migraines, an updated MRI in November 2011 was unremarkable. Her primary care physician, Dr. Jane Walloch, prescribed Frova for her migraines. Plaintiff reported the medication was helpful but costly. In April 2012, Dr. Walloch started Plaintiff on a trial of Sumatriptan. *Id.* Plaintiff testified that over-the-counter medication, like Excedrin, helped her migraines as well. *Id.* (citing R. 461). The ALJ noted that updated treatment records from 2013 and 2014 did not contain a discussion of Plaintiff's migraine headaches. *Id.*

In addition, the ALJ relied upon opinions of state agency consultants Dr. Janis Byrd and Dr. Syd Foster. In August 2011, Dr. Byrd opined that Plaintiff could perform the full range of work at the light exertional level. *Id.* (citing R. 415). Dr. Foster opined in March 2012 that Plaintiff could perform light work, but noted that, to avoid exacerbation of her lower back, Plaintiff should only occasionally stoop and crouch. *Id.* (citing R. 583–84). The ALJ gave these opinions great weight. She included Dr. Foster's limitations in the RFC but also included additional limitations based on Plaintiff's statements concerning her impairments. *Id.*

As to the severity of symptoms Plaintiff attributed to her mental impairments, the ALJ noted Plaintiff has been diagnosed with affective and anxiety disorders. R. 748. Plaintiff's treatment records revealed she had alcohol and substance abuse issues. *Id.* She sought treatment for these impairments through her primary care physician due to financial and insurance constraints. Plaintiff reported stressors related to her husband's death, in November 2010, but stated her use of Cymbalta resulted in good control of her symptoms. Although Cymbalta helped control her symptoms, she stated in May 2011 that she discontinued its use because it was too expense. She reported feeling more depressed and began engaging in self-harm behavior. Dr. Walloch observed that Plaintiff presented to the appointment with a flat affect, and she prescribed Citrolpram. In August 2011, Plaintiff indicated the medication was helping and reported she had not engaged in self-harm since the prior visit. By November 2011, Plaintiff noticed improvement with Citrolpram because she had no self-harming behaviors. Dr. Walloch noted Plaintiff presented with a normal mood and affect. *Id.* (citing R. 461–62). In April 2012, Plaintiff advised Dr. Walloch that she cut herself two months prior and questioned whether the Citalopram was strong enough. Dr. Walloch switched Plaintiff to Fluoxetine. *Id.* (citing R. 718–19). The medical records from 2013 and 2014 reveal normal mental

status examinations and do not contain reports of mood swings, depression, anxiety, or sleep problems. The records noted that Plaintiff's depression and anxiety were well controlled on Fluoxetine. *Id.* (citing R. 996).

The ALJ also acknowledged a consultative psychological examination performed by Dr. Michael Goldstein in 2012. The ALJ noted that during the examination, Plaintiff was cooperative, related well to Dr. Goldstein, was neatly groomed, and had good expressive and receptive language skills. R. 748. Plaintiff had mild psychomotor agitation, irritability, an anxious and depressed mood, and maintained a conversation with thoughts that were logical but pressured, tangential, and circumstantial. Plaintiff reported difficulty sleeping, suicidal ideation, and paranoid thoughts. Dr. Goldstein noted Plaintiff had limited insight into her condition and had poor judgment. He diagnosed Plaintiff with bipolar disorder, alcohol abuse, and a history of polysubstance abuse. *Id.* (citing R. 576–81). Dr. Goldstein concluded Plaintiff had a global assessment of functioning (GAF) score of 46. He opined that Plaintiff had extreme limitations appropriately responding to supervisors and coworkers and withstanding routine work stresses. Dr. Goldstein also determined Plaintiff had moderate limitations maintaining concentration, attention, and work pace as well as with her ability to adapt to changes. He opined that, despite Plaintiff's mental impairments and related symptoms and limitations, she only had mild restrictions in her ability to understand, remember, and carry out simple instructions. R. 749 (citing R. 581).

The ALJ further relied upon the Psychiatric Review Technique Form (PRTF) and the Mental Residual Capacity Assessment Form (MRFCF) completed by state consultative psychologist by Dr. Esther Lefevre based on her review of the record in August 2011. Dr. Lefevre opined that Plaintiff had mild limitations in activities of daily living and social functioning; moderate difficulties in

maintaining concentration, persistence, or pace; and no episodes of decompression. R. 748. Dr. Deborah Pape completed the same forms based on her review of the record in March 2012. Dr. Pape opined that Plaintiff has mild limitations in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. R. 749 (citing R. 604).

Plaintiff asserts that the ALJ violated the SSA's rules and regulations by concluding, upon cataloging the medical evidence, that she was capable of performing light work. But the ALJ's analysis did not end with the conclusion that the medical evidence did not seem to support the degree of incapacity claimed. She then explained that Plaintiff's activities of daily living do not establish the frequency and degree of the pain or other subjective symptoms alleged. R. 751. Plaintiff contends the ALJ improperly evaluated her activities of daily living because she equated Plaintiff's ability to perform these activities with an ability to work full time. The Seventh Circuit has chastised ALJs for finding that a claimant can work a full-time job simply because she can perform certain activities at home. *See Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014). "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson*, 671 F.3d at 647. Yet, an ALJ properly relies on a claimant's statements describing her daily activities to assess the credibility of the claimant's statements concerning the intensity, persistence, or limiting effects of the claimant's symptoms when the ALJ finds the admitted activities, though not enough to equate with full-time work, are inconsistent with the degree of pain and limitation claimed. *See Pepper*, 712 F.3d at 369 ("The ALJ concluded that, taken together, the amount of daily activities Pepper performed,

the level of exertion necessary to engage in those types of activities, and the numerous notations in Pepper's medical records regarding her ability to engage in activities of daily living undermined Pepper's credibility when describing her subjective complaints of pain and disability.").

Here, the ALJ properly relied on Plaintiff's admitted activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her impairments. The ALJ noted that Plaintiff cleaned, shopped, prepared simple meals, took care of her personal needs, walked her dog, used social media, read magazines, and occasionally drove. R. 745. The ALJ explained that her alleged symptoms and limitations may be overstated because Plaintiff testified that she traveled to and from Portland, Oregon in 2010 and 2011 to visit her family, during the time she complained of severe physical and mental symptoms, as well as the fact that she reported she walked her dogs every day, even though she complained of lower back pain that radiated into her leg. R. 745–46. The ALJ explained that Plaintiff may have exaggerated her symptoms because the diagnostic testing and clinical observations do not support her alleged degree of pain. The medical records, particularly the more recent records received after the remand, R. 979–1007, do not contain any indication that Plaintiff suffered from the severe and constant pain she described in her testimony at the hearing or that she was as limited as she claimed. It is not unreasonable to believe that if she truly was unable to sit, stand, or walk for more than five minutes at a time, she would have mentioned it to her doctors. Given the lack of medical findings of severe disability, the absence of consistent complaints in her medical records, as well as the ALJ's consideration of the record as a whole, the ALJ reasonably concluded that Plaintiff had significantly exaggerated her symptoms and found her "not entirely credible." R. 745. In short, the ALJ followed the regulations governing the

assessment of a claimant's statements concerning her pain and other symptoms. Her conclusion is not patently wrong and does not necessitate remand.

Finally, it is also worth noting that despite the ALJ's conclusion that Plaintiff was not fully credible in her statements concerning her symptoms and limiting effects of her conditions, she did not simply reject all of her statements. Instead, the ALJ gave partial credit to the statements she made at the administrative hearing and formulated an RFC that accommodated those limitations. R. 744. It is to Plaintiff's challenges to the ALJ's RFC determination that the court now turns.

**B. RFC Assessment**

A claimant's RFC specifies the most that a claimant can do despite the limitations caused by her physical and mental impairments. 20 C.F.R. § 404.1545(a)(1). An ALJ assesses a claimant's RFC "based on all the relevant evidence" in the case record, including severe and non-severe impairments as well as medical and non-medical evidence. *Id.* § 404.1545(e). The ALJ's hypothetical question to the VE must then incorporate all of the limitations included in the RFC. *O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). Even though the SSA must consider opinions from medical sources, the "final responsibility" for determining a claimant's RFC is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(2).

Plaintiff asserts the hypothetical question and the RFC were made without proper evaluation of the limiting effects of her impairments and fail to properly account for all of her supported physical and mental limitations. ECF No. 10 at 24. First, Plaintiff claims the ALJ erred in failing to fully inform the VE of her mental limitations and restrictions, including her moderate limitations in concentration, persistence, and pace (CPP). State agency consultant Dr. Lefevre opined that Plaintiff

had mild limitations in activities of daily living and social function; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompression. She elaborated that Plaintiff had moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Lefevre concluded that despite these moderate limitations in mental function, Plaintiff could meet the basic demands of unskilled work. R. 748–49 (citing R. 436–38).

State agency consultant Dr. Pape opined that Plaintiff has mild limitations in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation. R. 749 (citing R. 604). In the MRFCA, Dr. Pape explained that Plaintiff would have marked difficulties in her ability to understand, remember, and carry out detailed instructions and moderate restrictions in her ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavior extremes; and appropriately respond to changes in the work setting. *Id.* (citing R. 590–91). She opined that despite these limitations, Plaintiff could withstand the demands of unskilled work. *Id.* (citing R. 593).

18

Finally, Dr. Goldstein opined that Plaintiff had mild limitations in understanding, remembering, and carrying out simple instructions; extreme limitations in responding appropriately to supervisors and co-workers; moderate limitations maintaining concentration, attention, and work pace; extreme limitations withstanding routine work stresses; and moderate limitations in adapting to change. R. 581.

Plaintiff asserts that the ALJ was required to include each limitation Dr. Lefevre, Dr. Pape, and Dr. Goldstein found in the hypothetical question posed to the VE and in the RFC assessment. ECF No. 10 at 22. But this is not the law. Indeed, the Seventh Circuit has concluded that when a medical source submits an MRFCA without a narrative translation explaining what the checked boxes in the worksheet observations of the assessment mean, the ALJ must consider the worksheet observations on their own. *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015). But the court in *Varga* also noted that an ALJ "may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." *Id.* (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)).

In this case, although the mental health consultants all opined that Plaintiff had some limitations, none of them stated Plaintiff lacked the capacity to perform the tasks needed for the RFC formulated by the ALJ. Dr. Goldstein did not complete an MRFCA or note the specific ways Plaintiff is limited in the broad functional area of CPP. R. 581. Instead, he simply opined that Plaintiff had moderate limitations in maintaining concentration, attention, and work pace. R. 581. Dr. Lefevre concluded, "In consideration of the allegations and evidence claimant may have some difficulty with concentration and persistence at times but she is able to meet the demands of basic unskilled work." R. 438. Dr. Pape noted there are no severe findings of difficulty getting along with

others, supervisors, or coworkers but has moderate functional limitations in CPP and social functioning. R. 593. Nevertheless, she determined Plaintiff "is capable of withstanding the demands of unskilled as defined by SSA." *Id.* The RFC determined by the ALJ reasonably captured the limitations the consultants identified by limiting Plaintiff to "unskilled work, SVP-2 or less, with no fast-paced production line or tandem tasks and few if any, changes in the work setting, meaning that the workplace and tasks change no more than occasionally and only one to two times per month, at most. She can only occasionally interact with coworkers, supervisors, and the public. She may be off task up to 10 percent of the workday, in addition to normal breaks." R. 744.

To repeat, the RFC is the most the claimant can do despite her limitations, not what he can do with ease or without moderate difficulty. 20 C.F.R. § 404.1545(a). This is particularly important to note when one considers what the term "moderate" is intended to mean in this context. The recent rule revisions by the SSA clarify that a "moderate" limitation means that a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." SSA, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164 (Sept. 26, 2016) (effective January 17, 2017). Although the revised regulations became effective after the hearing was held in this case, the definitions "are consistent with how [SSA's] adjudicators have understood and used those words in [SSA's] program since [SSA] first introduced the rating scale in 1985." 81 Fed. Reg. 66147. As a result, the definitions set forth in the new rules "do not represent a departure from prior policy." *Id.*; *see also Capman v. Colvin*, 617 F. App'x 575, 579 (7th Cir. 2015) ("A moderate limitation is not a complete impairment." (citing *Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007))). Thus, moderate difficulty does not mean the claimant is

unable to perform the activity or task. I find no error in the ALJ's consideration of the limiting effects of her mental impairments.

Plaintiff further asserts that the ALJ did not properly evaluate her obesity in accordance with the SSA's regulations. SSR 02-1p requires that an ALJ "do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." SSR 02-1p, 2002 WL 34686281, at *3. The ALJ concluded Plaintiff's obesity was a non-severe impairment because she found no evidence that her obesity significantly diminished Plaintiff's ability to perform basic work activities. R. 740. The ALJ then explained that she considered Plaintiff's obesity in combination with her other impairments in accordance with SSR 02-1p. R. 740. She noted Plaintiff's weight gain to a mild level of obesity does not cause additional limitations. R. 747. In short, the ALJ sufficiently considered Plaintiff's obesity in combination with her other impairments in formulating Plaintiff's RFC.

Plaintiff next argues the ALJ failed to account for any limitations regarding her upper extremities, specifically her status post-carpal tunnel surgery. Here, the ALJ limited Plaintiff to light work to account for her history of cervical and lumbar spine surgery, ongoing complaints of lower back pain, and her history of carpal tunnel syndrome, which may cause enduring limitations in her ability to lift and carry more than 20 pounds occasionally and 10 pounds frequently. R. 747. Plaintiff does not mention what further limitations are required. The regulations require that the ALJ "consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 374184, at *5. Stated differently, if a plaintiff does not allege that her impairment causes a limitation or restriction, the ALJ cannot find that a limitation or restriction exists:

When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

*Id.* at *1. In short, no additional limitations related to Plaintiff's upper extremities were required.

Similarly, the ALJ was not required to include limitations regarding the swelling in Plaintiff's feet. Although Plaintiff reports in her function report that she had bilateral foot surgery that resulted in swollen feet, R. 203, her swollen feet are mentioned no where else in the record. In addition, Plaintiff never mentioned any limitations caused by this condition. The ALJ did not err in failing to create limitations of her own regarding Plaintiff's swollen feet.

Plaintiff also argues that the ALJ erred by failing to mention her use of a cane in the hypothetical question to the VE and in the RFC. Although Plaintiff noted in her function report that she used a cane, walker, and back brace, R. 192, the medical record is bereft of any indication that one was prescribed by a doctor for her general use as a result of any physical limitation caused by an impairment. The issue is not whether Plaintiff used a cane, but whether a cane was medically indicated. In short, the ALJ was not required to list Plaintiff's cane use as a limitation in the RFC.

Finally, Plaintiff challenges the ALJ's 10 percent off-task limitation to account for Plaintiff's headaches, pain, and other subjective symptoms because the ALJ never articulated what evidence supported that conclusion. ECF No. 10 at 17 ("How did 10% off task account for all of that and what supports it? . . . Why not 5%, 15%, 20%, or many days per month where DeCamp would be 100% off task? The ALJ gives no clue."). Plaintiff's argument assumes a precision that this kind of limitation does not allow. What Plaintiff fails to realize is that the ALJ's finding of an off-task limitation of up to 10% of the work day is based on her judgment as to the severity of Plaintiff's

impairments, not a mathematical measurement. A time-off-task limitation sufficiently reflects the degree to which the ALJ concluded the claimant may be off task each day due to her impairments and allows the VE to assess whether the claimant would be able to perform full-time work. *See Finzel v. Colvin*, No. 15-C-98, 2015 WL 4877412 (E.D. Wis. Aug. 14, 2015); *Ambelang v. Colvin*, No. 12-cv-805, 2014 WL 4926191 (W.D. Wis. Sept. 30, 2014). The ALJ's 10% time-off-task limitation reflects a reasonable judgment of the impact Plaintiff's impairments might have on her ability to work. Substantial evidence supports the ALJ's finding and she adequately explained how she arrived at her conclusion.

**C. Evaluation of Medical Opinion Evidence**

Plaintiff asserts the ALJ failed to properly evaluate the listings. The SSA rates four broad functional areas—CPP; activities of daily living; social functioning; and episodes of decompression—to determine whether a claimant's alleged mental impairment meets or medically equals the criteria for presumptive disability under one of the mental disorders in the SSA's Listings of Impairments. 20 C.F.R. § 404.1520a. The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. Episodes of decompensation is rated on a four-point scale: none, one or two, three, and four or more. *Id.* § 404.1520a(c)(4). If the ALJ finds the restrictions for the first three functional areas are "none" or "mild," and that there are no restrictions in the fourth area, she generally concludes that the impairment is not severe. *Id.* § 404.1520a(d)(1). If not, then the impairment is considered severe and the ALJ determines whether it meets or is equivalent in severity to a mental impairment in the SSA's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.01. To meet or medically equal the criteria of listings 12.04, 12.06, 12.08, and 12.09, the mental impairment must result in at least two of the following: marked

23

restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining CPP; or repeated episodes of decompensation.

Plaintiff asserts that the ALJ improperly substituted her lay assessment for that of Dr. Goldstein, who found that Plaintiff had extreme limitations in responding appropriately to supervisors and coworkers and extreme limitations withstanding routine work stress. ECF No. 10 at 23. She maintains that when the ALJ rejected Dr. Goldstein's "extreme" limitations, she failed to explain why the limitations were not "marked." This is important, Plaintiff contends, because had the ALJ found that Plaintiff had extreme, or even marked, limitations, she would have met the listings. *Id.* If the ALJ did what Plaintiff suggests, however, she would have actually erred in substituting her lay assessment for that of the medical experts. Instead, the ALJ properly evaluated the opinions of the medical experts.

The ALJ gave Dr. Goldstein's opinions regarding Plaintiff's extreme limitations less weight than that afforded to Dr. Pape's assessment of moderate limitations in social functioning because Dr. Goldstein's opinions are consistent only with Plaintiff's self-reported history of problems and are not consistent with the overall record. R. 742–43. A medical opinion based solely on the claimant's subjective remarks, rather than objective material facts, is not binding on the ALJ. *See Schaaf*, 602 F.3d at 875 (noting that subjective reports are "the opposite of objective medical evidence and an ALJ is not compelled to accept them"). The ALJ also reasoned that Dr. Goldstein's opinions were inconsistent with the overall medical record and his own findings. The ALJ noted that Plaintiff, despite her mental impairments and related symptoms, appeared to Dr. Goldstein as a "likeable person" and cooperated and related well to him during her exam. Plaintiff's demeanor at other

medical appointments and at the hearing do not support a finding that she has extreme difficulties getting along with others.

The ALJ gave great weight to the opinion of Dr. Pape, who found that Plaintiff had moderate limitations in social functioning because it was consistent with the record. The ALJ might also have noted the more generic reasons for crediting the State agency consultants' opinions such as the fact that they review the entire file and are experts in the Social Security disability programs. *See* SSR 96-6p; 20 C.F.R. § 1527(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."). The ALJ ultimately concluded that "in light of the record as a whole, including medical evidence and evidence of her activities," Plaintiff has moderate, not extreme, limitations. R. 743. The ALJ did not err in refusing to assign more weight to Dr. Goldstein's findings.

Although Plaintiff does not dispute the ALJ's decision to give Dr. Goldstein's opinion that she had "extreme limitations" in certain areas less weight than that of the state agency consultants, she further argues that the ALJ erred because she failed to state the weight she gave Dr. Goldstein's findings that Plaintiff was moderately or mildly limited in other areas. Yet, Dr. Goldstein's opinions regarding these limitations are consistent with the findings of the state agency consultants. It is clear from the ALJ's decision that she accepted each psychologists' respective opinion that Plaintiff had moderate limitations in CPP. R. 742–43. The ALJ did not commit reversible error by failing to explicitly state that she not only gave Dr. Pape's opinions great weight but also gave Dr. Goldstein's consistent and identical opinions the same amount of weight. The ALJ properly evaluated the

opinion evidence regarding Plaintiff's mental impairments.  It thus follows that the ALJ did not fail to properly evaluate the listings.

**D. Vocational Expert and Dictionary of Occupational Titles**

Plaintiff challenges the reliability of the VE's testimony and the VE's reliance on the Dictionary of Occupational Titles (DOT).  The VE testified that Plaintiff was incapable, given the RFC set out in the ALJ's hypothetical questions, to perform her past jobs as a bartender and server.  R. 798.  The VE then identified several jobs listed in the DOT that Plaintiff could perform, such as machine tender, sorter, and office tender.  The VE testified there existed approximately 183,000 machine tender positions in the United States workforce, 15,000 of which can also be performed as a sedentary job; 203,000 sorter positions, 77,000 of which can be performed as a sedentary job; and 332,000 office helper positions, 99,000 of which can be performed as a sedentary job.  *Id.*  Based upon this testimony, the ALJ concluded Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff asserts the VE did not properly substantiate the number of jobs she identified that Plaintiff could perform.  Yet, during the hearing, counsel did not object to the basis for the VE's conclusions about the number of jobs available or the nature of the work.  Given the absence of any objections during the hearing, the ALJ was in no position to do anything but rely on the VE's testimony.  Raising this challenge for the first time in district court is hardly the forum for such an argument.

Lastly, Plaintiff's challenge to the VE's and ALJ's reliance on the DOT is unavailing.  Although the Seventh Circuit has criticized the SSA for failing to endorse O*NET, which it described as "the most current manual of job descriptions," despite the SSA's awareness of "the

obsolescence of the Dictionary of Occupational Titles," the court did not hold that it is *per se* error to rely on the DOT. *Dimmitt v. Colvin*, 816 F.3d 486, 488–89 (7th Cir. 2016). Given the fact that the DOT remains the first in the list of publications of job data of which the SSA has taken administrative notice, 20 C.F.R. § 404.1566(d)(1), this is not surprising. Holding that use of the DOT constitutes *per se* error would call into question all of the SSA adjudications in which the DOT plays a role. It would also run afoul of the rule requiring judicial deference "to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Chevron v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *Astrue v. Capato*, 566 U.S. 541, 558 (2012) ("*Chevron* deference is appropriate when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." (internal quotation omitted)). The ALJ did not err in relying on the VE's testimony in this case.

## CONCLUSION

For the above reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this   19th   day of March, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court